140 F.3d 240
 81 A.F.T.R.2d 98-1198, 98-1 USTC P 50,273
 NORFOLK SOUTHERN CORPORATION, and affiliated companies;
Norfolk & Western Railway Company, and affiliated
companies, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
Tax Foundation; Institute of International Container
Lessors, Amici Curiae.
 No. 97-1662.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 4, 1997.
Decided March 20, 1998.
 
 ARGUED: Frederick Alexander Richman, O'Melveny & Myers, L.L.P., New York City, for Appellants. Teresa Ellen McLaughlin, Tax Division, U.S. Dept. of Justice, Washington, DC, for Appellee. ON BRIEF: Andrew J. Frackman, Joseph G. Giannola, O'Melveny & Myers, L.L.P., New York City; Newman T. Halvorson, Jr., Sean F. Foley, Covington & Burling, Washington, DC, for Appellants. Loretta C. Argrett, Asst. Atty. Gen., Sally J. Schornstheimer, Tax Div., U.S. Dept. of Justice, Washington, DC, for Appellee. Brian S. Harvey, Baker & Hostetler, L.L.P., Washington, DC, for Amicus Curiae Tax Foundation. Kenneth Klein, Daniel J. Mulcahy, Cadwalader, Wickersham & Taft, Washington, DC, for Amicus Curiae Institute.
 Before NIEMEYER, Circuit Judge, WILSON, Chief United States District Judge for the Western District of Virginia, sitting by designation, and JONES, United States District Judge for the Western District of Virginia, sitting by designation.
 Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Chief Judge WILSON and Judge JONES joined.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 Section 48(a)(2)(B)(v) of the Internal Revenue Code (1962) provides for an investment tax credit for cargo containers "used in the transportation of property to and from the United States." The taxpayers argue that the phrase "used in the transportation of property to and from the United States" includes not only containers actually so used but also containers outside the United States held available for such use. The Tax Court disagreed and held, among other things, that in order to qualify for the investment tax credit, the taxpayers must demonstrate that their containers made some minimum contact with the United States at least once each taxable year for which the credit is claimed. For the reasons that follow, we affirm.
 
 
 2
 * In 1981, Flexi-Van, Inc., added 38,037 intermodal cargo containers to its container fleet, 85% of which were delivered to Flexi-Van in countries other than the United States. At the time, Flexi-Van was the second largest container leasing company in the world. In November of that year, Flexi-Van transferred investment tax credits and other tax benefits to which it might be entitled for those containers to Norfolk and Western Railway Company in exchange for $18 million. Under the agreement, which was enabled by the Economic Recovery Tax Act of 1981, I.R.C. § 168(f)(8) (repealed a year later by the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97-248, § 209), Flexi-Van was able to retain ownership of the containers while, at the same time, transferring tax benefits of which it could not take advantage. In accordance with its agreement with Flexi-Van, Norfolk and Western and, subsequently, Norfolk Southern Corporation (hereafter collectively referred to as "Norfolk" or "Taxpayers") claimed investment tax credits and accelerated depreciation deductions for the tax years 1981-85 with respect to all of the containers for which tax benefits were assigned. The investment credit and the accelerated cost recovery system were repealed by the Tax Reform Act of 1986, Pub.L. No. 99-514, §§ 201, 203, 211(a).
 
 
 3
 Since their first use in the 1950s, intermodal cargo containers have revolutionized the transportation industry because such containers can be transported among vessels, trucks, and railroads without any intermediate loading or unloading of their contents. Containerization became particularly significant in trade routes involving the United States so that as of 1981, one-half of the world's container traffic was to or from the United States. One of the factors contributing to the growth of container leasing companies in the United States was the favorable tax treatment provided by the investment tax credits and accelerated depreciation deductions which were added to the Internal Revenue Code in 1962. By lowering the effective cost to the leasing companies of containers purchased for lease, the investment tax credit in effect subsidized the American container leasing industry.
 
 
 4
 On January 29, 1990, the Commissioner of Internal Revenue issued Revenue Ruling 90-9, 1990-1 C.B. 46, which required taxpayers claiming tax benefits for investment in cargo containers to prove that their containers were "used substantially in the direct transportation of property to or from the United States during each taxable year of its recovery period." Under the Ruling, "direct transportation" was defined as
 
 
 5
 the transportation of property by the container with the United States as the origin or terminus of the trip for the container and the property. Thus, a container is not engaged in the direct transportation of property to or from the United States merely because it transports property from one foreign country to another foreign country.
 
 
 6
 Id. The Ruling, which applied retroactively, recognized that taxpayers often will lack adequate records to trace the usage of their cargo containers to establish whether they entered the United States during the taxable year. Accordingly, the Ruling was accompanied by the issuance of Revenue Procedure 90-10, which allowed taxpayers to elect irrevocably an investment tax credit with respect to 50% of any containers put in service from 1981 onward. Rev. Proc. 90-10, 1990-1 C.B. 467. Thus, companies could take an investment tax credit either with respect to containers they could prove were used substantially in the direct transportation of property to or from the United States during each taxable year or with respect to 50% of their containers without making any further showing.
 
 
 7
 Because Flexi-Van could not document which of its containers had actually been used to transport property to and from the United States for any past years, Norfolk, as the assignee of Flexi-Van's investment tax credits, was required either to elect receiving investment tax credits for 50% of its containers or to forgo all credits. Norfolk refused to make an election under Rev. Proc. 90-10, with the result that the Commissioner of Internal Revenue issued notices of deficiency disallowing all investment tax credits and accelerated depreciation deductions claimed by Norfolk for the 1981-85 period. Norfolk claimed that this notice was inconsistent with earlier I.R.S. audits which took no exception to Norfolk's claims of tax credits.
 
 
 8
 Norfolk filed petitions in the Tax Court challenging the Commissioner's interpretation of the statute and his rulings, and at trial Norfolk contended that when the Tax Code authorized an investment tax credit for containers "used in the transportation of property to and from the United States," the word "used" included property that was merely available for use in such transportation. Norfolk also contended that the Commissioner could not reasonably announce an "actual use" test in 1990 and apply it retroactively to 1981. Finally, applying the Commissioner's interpretation, Norfolk presented statistical evidence that 89.7% of its containers actually took at least one trip to or from the United States by December 31, 1983.
 
 
 9
 Following trial, the Tax Court issued an opinion agreeing substantially with the Commissioner. 104 T.C. 13, 1995 WL 9185 (1995). It held that the ordinary meaning of the words "used in the transportation of property to and from the United States," I.R.C. § 48(a)(2)(B)(v), meant that in order to claim the tax credits, the containers in question were required to have "some minimum contact with the United States" on at least one occasion during each taxable year for which the credits were claimed. 104 T.C. at 45, 47-48. The court concluded further that the Commissioner did not abuse his discretion in applying the test retroactively. Id. at 58-61. In determining the number of containers that met the test, the Tax Court discredited most of the expert witnesses who had testified regarding the percentages of containers that actually had contact with the United States because the "experts, especially respondent's in our view appear to have based their conclusions on assumptions which seem tailored to arrive at a predetermined end." Id. at 48. The Tax Court concluded that the Taxpayers were entitled to all of the investment tax credits claimed with respect to 14,436 containers, one-third of the investment tax credits claimed with respect to 18,538 containers, and no tax credits with respect to 5,063 containers. Thus, of the $46.8 million claimed for investment tax credits, the Tax Court disallowed $5.3 million. This appeal followed.
 
 II
 
 10
 With the enactment of the Revenue Act of 1962, a credit against income tax was granted "with respect to any taxable year" for investments in "new Section 38 property ... placed in service by the taxpayer during such taxable year." I.R.C. § 46(c)(1) (1962). This investment tax credit was provided to encourage investment in United States production facilities and thereby increase their ability to compete in international commerce. Accordingly, the credit is generally inapplicable to property "which is used predominantly outside the United States," I.R.C. § 48(a)(2)(A) (1962), except that it applies to investments in "any container of a United States person which is used in the transportation of property to and from the United States," I.R.C. § 48(a)(2)(B)(v) (1962).
 
 
 11
 The Taxpayers claim entitlement to investment tax credits under these provisions with respect to the Flexi-Van containers which were under lease all over the world. They contend that the requirement that the containers be "used in the transportation of property to and from the United States" did not mean that the property had to be actually used in such transportation. Rather, they argue, property is "used" in an ongoing trade or business when it is made available for such use, whether or not the container is ever actually used to transport property to or from the United States. They maintain that if Congress had intended to require actual use in § 48(a)(2)(B)(v), it would have employed the word "actually" in conjunction with the word "used" as it did in other sections of the Tax Code, such as in § 971(d)(2) and § 464(a).
 
 
 12
 The Commissioner contends that the word "used" has no fixed meaning in the Tax Code and that it must derive its meaning from context. He maintains that in this case the word "used" is qualified by the phrase "in the transportation of property to or from the United States." The Commissioner argues that to allow an investment tax credit for containers that never actually transported property to or from the United States "would be inconsistent with Congress' intent to encourage investment in the United States."
 
 
 13
 The issue thus presented is whether the Taxpayers may claim an investment tax credit for containers which are held available for use outside the United States for shipments to the United States when such containers cannot be shown to have actually been used during the tax year in the transportation of property to or from the United States. Stated otherwise, we must determine whether the phrase "used in the transportation of property to and from the United States" requires proof that the containers actually "touch" the United States. This question is one of first impression.
 
 
 14
 In approaching this issue, we note that determinations of tax liability by the Commissioner are entitled to a presumption of correctness. See Winstead v. United States, 109 F.3d 989, 993 (4th Cir.1997); see also United States v. Janis, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976). Moreover, because tax credits and deductions are a matter of legislative grace, taxpayers bear the burden of proving entitlement to the credits they claim on their returns. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84, 112 S.Ct. 1039, 1042-43, 117 L.Ed.2d 226 (1992).
 
 
 15
 We turn first to the language of the statute to apply what the Supreme Court has termed the "first criterion in the interpretive hierarchy, a natural reading of the full text." United States v. Wells, 519 U.S. 482, ----, 117 S.Ct. 921, 927, 137 L.Ed.2d 107 (1997); see also United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940) ("There is, of course, no more persuasive evidence of the purpose of the statute than the words by which the legislature undertook to give expression to its wishes.").
 
 
 16
 While we share the observation made by the Taxpayers that the term "used" has a broad meaning which of necessity does not exclude "made available for use," when examined in its statutory context, the term takes on a narrower definition. In the statute, "used" is limited by the phrase "in the transportation of property to and from the United States." I.R.C. § 48(a)(2)(B)(v) (1962). We believe that a natural reading of the entire phrase does not permit the interpretation that containers can be stored, for example in Hong Kong, for potential use and thus be used "in the transportation of property to and from the United States." The transportation of property to and from the United States thus provides the qualification as to the type of property for which the investment tax credit is available. To interpret the statute to include property located anywhere in the world that is available for use in the transportation of property to and from the United States defeats that limitation and, indeed, the very purpose for the existence of the tax credit, which is implicit in the language of the statute itself. Section 48(a)(2) establishes the general rule that the tax credit is not available for property used predominantly outside the United States, and the specific provision addressing cargo containers provides an exception so long as the container is one of a United States person and the container has been used in the transportation of property to or from the United States. We thus agree with the Tax Court that property, to qualify for the tax credit under I.R.C. § 48(a)(2)(B)(v) (1962), must have "some minimum contact" with the United States.
 
 
 17
 Although we find that the language of the statute is clear and that we are therefore not required to examine the legislative history, see United States v. Gonzales, 519 U.S. 482, ----, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997), an examination of the legislative history of the Revenue Act of 1962 confirms the natural reading of the statute. See Wells, 519 U.S. at ----, 117 S.Ct. at 928 (using statutory history to confirm the natural meaning). The Senate report accompanying the Revenue Act of 1962 noted that the purpose underlying the investment tax credit was to allow the United States to compete better in international commerce by encouraging the "modernization and expansion of the Nation's productive facilities" and by increasing the "relative attractiveness of investment at home compared with investment abroad." S.Rep. No. 1881, reprinted in 1962 U.S.C.C.A.N. 3304, 3314. The same report noted that property used predominantly outside the United States was not eligible for the investment tax credit, subject to exceptions for certain types of property having a nexus with the United States. Id. at 3319. This requirement of contact with the United States was crucial "since the primary purpose of the credit is to encourage investment within the United States." Id.
 
 
 18
 Taxpayers argue that our natural reading does not reach the correct interpretation because (1) the language of the container exception, "in contrast to the language of other I.R.C. sections ... does not refer to an 'actual use' test"; (2) case law prior and subsequent to the enactment of the container exception in 1962 has uniformly held that the term "used" does not mean "actually used," and has given the verb "used" an expansive definition; and (3) courts have consistently held that the investment tax credit provisions of the Tax Code are to be "liberally construed" in favor of the taxpayer.
 
 
 19
 First, we find little merit to the argument that, as employed in the Tax Code, "used" must include "available for use" and cannot be limited to "actually used" because in other sections of the Code the term "actually used" is employed to make that distinction. Taxpayers point to two other provisions of the Tax Code as examples where Congress used the words "actually used": I.R.C. § 464(a) (providing that certain farming deductions "for amounts paid for feed, seed, fertilizer, or other similar farm supplies shall only be allowed for the taxable year in which the feed, seed, fertilizer or other supplies are actually used or consumed, or, if later, for the taxable year for which allowable as a deduction" (emphasis added)) and I.R.C. § 971(d)(2) (defining export promotion expenses as "rentals or other payments for the use of property actually used for such purpose" (emphasis added)).
 
 
 20
 This argument presumes that the definition of the word "used" can have but one meaning, regardless of context. Such an argument, however, ignores the importance of context in determining the meaning of language. See Deal v. United States, 508 U.S. 129, 131-32, 113 S.Ct. 1993, 1995-97, 124 L.Ed.2d 44 (1993). When the Tax Code employs "used" in § 464(a), granting a deduction for feed "actually used or consumed" in a given tax year, the term "actually" limits "used" in a manner that excludes another meaning that may reasonably be entertained in that context. If the farmer made a large purchase of feed sufficient for two years' needs, under § 464(a) he would only be able to deduct the amount which was fed to the chickens in the tax year. By including the limiting adverb "actually," the Code excludes the interpretation that "used" could also include feed paid for and held for use, but not fed to the chickens.
 
 
 21
 On the other hand, when the Tax Code employs "used" to provide a tax credit for containers "used in the transportation of property to and from the United States," the phrase "in the transportation of property to and from the United States" limits the scope of the term "used" to distinguish such containers from containers not used in such transportation, i.e., containers stored or held for use. Had the Code provided, for example, a tax credit for containers "used in the taxpayer's business," without further qualification, the containers purchased for use but not actually used could arguably be encompassed by the word "used." In the section before us, however, the Code limits "used" by the phrase "in the transportation of property to and from the United States," and we must take that limitation at face value. For this reason, we find that the Taxpayers' analogies to other provisions of the Tax Code are unpersuasive.
 
 
 22
 The Taxpayers' second contention, that case law from the tax context and otherwise establishes a broad range of meanings for the word "used," likewise fails to recognize the importance of context. While it may be true that precedent establishes a broad range of meaning for the word "used," that fact cannot fairly be advanced to argue that the word "used" in the statute before us must be stripped of its context. This argument, on the contrary, demonstrates that the wide range of possible meanings for the word "used" requires careful consideration of context. See Deal, 508 U.S. at 131-32, 113 S.Ct. at 1995-97. We, like the Tax Court, "have found no cases, and petitioners have cited none, where the word 'used' was found to have a fixed meaning." 104 T.C. at 39.
 
 
 23
 Finally, we reject the Taxpayers' argument that the courts' policy of liberally construing investment tax credit provisions in favor of taxpayers demands that we adopt their interpretation. Although some courts have held that investment tax credit provisions should be liberally construed, see, e.g., Morrison, Inc. v. Commissioner, 891 F.2d 857, 864 (11th Cir.1990), to adopt that posture in order to hold that the investment tax credit is available for containers which are merely "available for use" for transportation of property to and from the United States would mean that virtually every container owned by a "United States person" would qualify as Section 38 property. Such a result would render the portion of § 48(a)(2)(B)(v) which reads "in the transportation of property to and from the United States" meaningless. It would also run contrary to the fact that § 48(a)(2)(B)(v) is a narrow exception to the general proposition that property used predominantly outside the United States is not eligible for Section 38 treatment. Indeed, the Taxpayers' interpretation would eviscerate the tax credit's purpose of promoting investment in United States property in order to make the United States more competitive in international commerce.
 
 
 24
 In addition to arguing that "use" includes "available for use," the Taxpayers argue in this case that the Tax Court erred in interpreting the Tax Code to require that a container, to qualify for a tax credit, have contact with the United States in each tax year. The Tax Court found:
 
 
 25
 [I]f a container does not transport property to or from the United States at least once in each taxable year after the year it was placed in service, the container ceases to be section 38 property because of the change in its use.
 
 
 26
 104 T.C. at 47. We agree with this conclusion and reject the Taxpayers' argument.
 
 
 27
 We begin by recognizing that the requirements for qualifying property for an investment tax credit must be made based on the circumstances of the property when it was first placed in service. See Bloomberg v. Commissioner, 74 T.C. 1368, 1372, 1980 WL 4548 (1980); World Airways, Inc. v. Commissioner, 62 T.C. 786, 809, 1974 WL 2774 (1974), aff'd, 564 F.2d 886 (9th Cir.1977); see also 26 C.F.R. §§ 1.46-3(d)(4)(i), 1.48-1(a). Thus, under our interpretation of I.R.C. § 48(a)(2)(B)(v), if a container did not meet the statutory requirement that it had been "used in the transportation of property to and from the United States," it would not have qualified for an investment tax credit. Also, if property that has once qualified for an investment tax credit loses its status as Section 38 property, the investment tax credit is recaptured. See I.R.C. § 47(a); 26 C.F.R. § 1.47-1(a). Thus, the Tax Code requires that for each taxable year that a taxpayer claims an investment tax credit, the taxpayer must demonstrate that the property still qualifies as Section 38 property. For these reasons, we conclude that the Tax Court was correct in ruling that the Tax Code requires the qualification of a cargo container by contact with the United States each taxable year--i.e., that it be used at least once each taxable year in the transportation of property to and from the United States.
 
 
 28
 In summary, we hold that in order to claim an investment tax credit under I.R.C. § 48(a)(2)(B)(v) (1962) for cargo containers, the taxpayer must carry the burden of demonstrating that the containers were used in the transportation of property to or from the United States at least once in each taxable year for which the credit is claimed.
 
 III
 
 29
 The Taxpayers next argue that the Commissioner abused his discretion in applying Rev. Rul. 90-9 retroactively to 1981. That ruling required taxpayers, claiming a credit for investment in containers, to demonstrate that they used the containers "substantially in the direct transportation of property to or from the United States during each taxable year of its recovery period." It required the maintenance of records to make that showing, and if the taxpayer did not have records, it afforded the taxpayer, through Rev. Proc. 90-10, the opportunity to elect a tax credit with respect to 50% of its containers. The Taxpayers argue that the Tax Court erred in failing to find that the Commissioner abused his discretion because (1) it is unfair for the Commissioner, having conducted multiple audits of the Taxpayers, to have changed the policy in midstream; (2) the application of the Ruling has led to disparate treatment of various companies in the container industry; and (3) the Commissioner violated his own standards applicable to when rulings are retroactive.
 
 
 30
 Our review of the Commissioner's decision to apply revenue rulings on a retroactive basis is for abuse of discretion. See, e.g., Baker v. United States, 748 F.2d 1465, 1467 (11th Cir.1984) (holding that although courts presume prospective application, they review retroactive application for abuse of discretion). Our inquiry is thus "whether under all the circumstances, retroactive application is warranted." Id.
 
 
 31
 The resolution of this issue follows directly from the recognition that revenue rulings do not have the force of law. See Dixon v. United States, 381 U.S. 68, 73, 85 S.Ct. 1301, 1304-05, 14 L.Ed.2d 223 (1965). They are the Commissioner's interpretation of the law which he may change when he concludes that he has been incorrect in an earlier interpretation. Whether or not the Commissioner has changed his position or regardless of what his interpretation had been the day before or several years before, the Commissioner must follow the law enacted by Congress and the regulations duly promulgated under that law, and not his rulings should they depart from the law. In rejecting a similar claim of unfairness arising from the Commissioner's change of position in Dickman v. Commissioner, 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984), the Supreme Court stated:
 
 
 32
 [I]t is well established that the Commissioner may change an earlier interpretation of the law, even if such a change is made retroactive in effect. This rule applies even though a taxpayer may have relied to his detriment upon the Commissioner's prior position. The Commissioner is under no duty to assert a particular position as soon as the statute authorizes such an interpretation.
 
 
 33
 Id. at 343, 104 S.Ct. at 1093-94. (Footnotes and citations omitted).
 
 
 34
 Moreover, in this case, the industry was not surprised by the position reflected in Rev. Rul. 90-9. On the contrary, it provided input to the Commissioner as the Ruling was developed over a period of ten years. As the Commissioner notes in his brief, "Rev. Rul. 90-9 ... was hardly a bolt out of the blue.... [T]he Commissioner initiated a project in 1980 to develop a position with regard to the meaning of the phrase 'used in the transportation of property to and from the United States.' The container leasing industry was well aware of this fact, for they supplied information to the Commissioner several times in 1982." Thus, the interpretation of I.R.C. § 48(a)(2)(B)(v) (1962) was open for question even before Norfolk purchased the tax credits involved in this case.
 
 
 35
 Notwithstanding the existence of a significant dialogue between the industry and the Commissioner prior to the issuance of Rev. Rul. 90-9, the basic principle of tax law--that the taxpayer has the burden of demonstrating its claim for tax credits and thus, in the case of containers, must demonstrate that they were used in the transportation of property to and from the United States--was firmly established well before 1981. It is exceptional that the Taxpayers in this case could believe that they were entitled to claim such credits without maintaining sufficient records to prove them.
 
 
 36
 The Taxpayers' argument that the retroactive application of Rev. Rul. 90-9 "creates an unfair disparity in the treatment of direct competitors" is based upon the allegation that other container leasing companies, TransAmerica ICS, Inc., and XTRA, Inc., were treated differently from Norfolk. This argument, however, fails to recognize that the tax assessments with respect to those companies arose in the context of settlement offers. See 104 T.C. at 58. Moreover, because we recognize that Rev. Rul. 90-9 is a reasonable interpretation of the Tax Code, the Taxpayers cannot argue that they should be excused from having to pay their taxes simply because other taxpayers were treated differently in the past. See, e.g., City of Galveston v. United States, 33 Fed. Cl. 685, 708 (1995), aff'd, 82 F.3d 433 (Fed.Cir.1996) ("[A] taxpayer cannot premise its right to an exemption by showing that others have been treated more generously, leniently or even erroneously by the IRS.").
 
 
 37
 Finally, we reject the Taxpayers' argument that Rev. Rul. 90-9 violated the Commissioner's own standards for issuing retroactive rulings. Even if the Ruling represented a departure from the Commissioner's past actions, such an argument does not form a basis to contend that it should not be enforced as a correct interpretation. "[T]he Commissioner's acquiescence in an erroneous decision, published as a ruling, cannot in and of itself bar the United States from collecting a tax otherwise lawfully due." Dixon, 381 U.S. at 73, 85 S.Ct. at 1304.
 
 IV
 
 38
 Finally, the Taxpayers contend that the Tax Court erred in applying its interpretation to the facts in this case. We review the Tax Court's factual findings for clear error. See Hendricks v. Commissioner, 32 F.3d 94, 97 (4th Cir.1994). "The Tax Court's decision is clearly erroneous only where 'although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed.' " Id. (quoting Faulconer v. Commissioner, 748 F.2d 890, 895 (4th Cir.1984)).
 
 
 39
 In determining the number of containers that were subject to tax credits under I.R.C. § 48(a)(2)(B)(v) (1962), the Tax Court properly considered all of the evidence available, including competing statistical data supplied by experts for both sides. In considering the question of what percentage of containers actually entered the United States during the period in question, it is noteworthy that the Tax Court gave the Taxpayers' expert significantly more credibility than it gave to the Commissioner's. See 104 T.C. at 48-49. Indeed, the Tax Court gave "no weight to the expert opinions expressed by[the Commissioner's] expert witnesses," id. at 48, and accepted some of the Taxpayers' experts' conclusions even though it did not "embrace [them all] wholeheartedly," id. at 49. Moreover, in making its final determinations as to the numbers of containers that qualified for the tax credits, the Tax Court allowed the Taxpayers to claim investment tax credits for one-third of any "remaining" containers for which there was no proof of whether they had entered the United States. Id. at 57. In the end, in making its findings as to which containers were eligible for the investment tax credit, the Tax Court used its "best judgment, on the basis of the record as a whole," id., and after examining the record in this case, we cannot conclude that these findings were clearly erroneous.
 
 
 40
 For all of the foregoing reasons, the decision of the Tax Court is affirmed.
 
 
 41
 AFFIRMED.