In re **HEILIG–MEYERS COMPANY,**
**et al., Debtors.**

**Heilig–Meyers Company,**
**et al., Plaintiffs,**

v.

**United States of America, Internal**
**Revenue Service, Defendant.**

**Bankruptcy No. 00–34533–DOT.**
**Adversary No. 03–03295–DOT.**

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Sept. 28, 2004.

Bruce H. Matson, LeClair Ryan, Richmond, VA, for Plaintiff.

Katherine Macaulay Mueller, Troy Savenko, LeClair Ryan, A Professional Corporation, Heilig–Meyers Furniture West, Inc., HMY Star, Inc., HMY RoomStore, Inc., MacSaver Financial Services, Inc., Richmond, VA, Richard G. Jacobus, Department of Justice–Tax Division, Washington, D.C., for Defendant.

### MEMORANDUM OPINION

DOUGLAS O. TICE, JR., Chief Judge.

Trial in this adversary proceeding was held on January 14 and 28, 2004. The proceeding was commenced by the related debtors Heilig Meyers Company, Heilig–Meyers Furniture Company, Heilig–Meyers Furniture West, Inc., HMY Star, Inc., HMY Room Store, Inc., and MacSaver Financial Services, Inc. objecting to the proof of claim filed by the Internal Revenue Service (the "I.R.S." or the "Service"). Debtors also seek a determination of the extent to which they have any liability to the Service in respect of their federal in-

come tax returns for their fiscal year ending February 28, 1997.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. §§ 502, 505, and 542, and this adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

For the reasons stated below, the court finds that debtors have failed to carry their burden of proof, and the Service's claim will be allowed.

## INTRODUCTION

Section 475 of the Internal Revenue Code requires taxpayers who are securities dealers to "mark to market" their securities, including certain loans and financial products, held at year-end. A taxpayer marks to market its securities by treating the securities as sold for their fair market value on the last business day of the taxpayer's taxable year. The taxpayer recognizes gain or loss equal to the difference between the fair market value of the securities on the last business day of the taxpayer's taxable year and the recorded value of the securities.

As originally enacted by the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, I.R.C. § 475 permitted retailers and other sellers of nonfinancial goods and services who make loans to customers to elect dealer status and treat accounts receivable as securities.[1] For debtors' fiscal year ending February 28, 1997, they received approval from the Service to treat their accounts receivable as "securities" pursuant to I.R.C. § 475. In filing their income tax return for that year, debtors treated their accounts receivable as securities, determined that the fair market value of the receivables was less than book value

and using the "mark to market" determination claimed a loss on the calculated difference between book value and fair market value. Subsequently, the Service audited the debtors' 1997 tax return and disallowed a portion of the claimed "mark to market" loss.

The issue in this proceeding is whether the debtors correctly determined the amount of the mark to market valuation loss in their tax return for their 1997 tax return. To resolve this issue, the court must find whether debtors correctly calculated the fair market value of their accounts receivable as of February 28, 1997.

## FINDINGS OF FACT

By letter debtors' authorized agent signed on January 7, 1998, debtors retained Ernst & Young, LLP, to determine the fair market value of their accounts receivable as of February 28, 1997, for purposes of the "mark to market" provision of I.R.C. § 475. Ernst & Young performed a valuation study of Debtor's accounts receivable as of that date, and pursuant to Ernst & Young's findings, debtors claimed a $45,922,261 deduction on their federal income tax return for the year ending February 28, 1997. The $45,922,261 deduction equals the difference between an earlier recorded book value of the receivables of $1,073,234,932 as of February 28, 1997, and the recomputed I.R.C. § 475 fair market value of $1,027,312,671. The I.R.C. § 475 deduction contributed to a net operating loss for the year ending February 28, 1997, and debtors carried back the entire net operating loss, inclusive of the I.R.C. § 475 deduction, as a deduction from taxable income for the year ending February 28, 1994.

---

1. Congress subsequently amended I.R.C. § 475 to exclude accounts receivable from the definition of "securities" thereunder, effective for taxable years ending after July 22, 1998.

Prior to the filing of debtors' Chapter 11 petition, the Service commenced an examination of debtors' federal income tax returns for a period of years inclusive of their fiscal year ending February 28, 1997. The Service determined that debtors undervalued their accounts receivable for purposes of I.R.C. § 475 as of February 28, 1997 and recomputed the fair market value of those receivables as being $1,048,949,674. Consequently, the Service disallowed $21,628,003 of debtors' previously claimed deduction of $45,922,261. The $21,628,003 disallowance equals the difference between debtors' fair market value computation of $1,027,312,671 and the Service's fair market value computation of $1,048,949,674. The $21,628,003 difference between the parties' valuations represents 2.02% of the original book value of the receivables of $1,073,234,932.

### DISCUSSION AND CONCLUSIONS OF LAW

Due to the dispute regarding the fair market value of debtors' accounts receivable under I.R.C. § 475 as of February 28, 1997, the United States seeks to recover $3,923,904 of a tentative refund earlier paid to debtors plus statutory prepetition interest of $882,080. These sums total $4,805,984, of which the Service sets forth $901,046 as a secured claim and $3,904,938 as an unsecured priority claim on its proof of claim.

If the court finds that debtors properly valued their accounts receivable, the United States will not have an allowable claim against debtors with respect to the I.R.C. § 475 issue. If the court finds that the Service properly valued debtors' accounts receivable, the United States will have an allowable claim of $4,805,984 against debtors with respect to the I.R.C. § 475 issue. If the court makes a finding that supports an intermediate value between the values the parties argue in support of, the United States will have an allowable claim against debtors that is greater than zero dollars but less than $4,805,984.

Also in this litigation are two undisputed claims of $80.89 for pre-petition withholding tax and interest assessed for the period ending December 31, 1999, and $9,842.62 for pre-petition highway use tax assessed for the period ending June 30, 2001.

Determining which party more accurately values the debtors' accounts receivable would be a challenging task for the court. The parties do not initially appear to the court to stand on opposite sides of a vast chasm. They initially appear to almost agree. $21,628,000 separates the results of the parties' respective valuation studies, and this amount is only 2.02% of the pre mark to market value of the accounts receivable. Fortunately, the court must examine neither the narrow difference between the results of the parties' valuations studies, nor the accuracy of one valuation study relative to the other. The only determination required of the court is whether the debtors have applied a valuation method that clearly reflects a recognizable loss. This determination rests on the persuasiveness of the debtors' valuation study.

The Supreme Court has stated, "[T]he burden of proof in a tax claim in bankruptcy remains where the substantive law puts it." *Raleigh v. Ill. Dept. Of Revenue*, 530 U.S. 15, 26, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000). Otherwise, which party has the burden of proof would depend on whether the Service initiated proceedings against a taxpayer prior to a filing of a bankruptcy petition. *Raleigh*, 530 U.S. at 26, 120 S.Ct. 1951. In a federal tax controversy, the Commissioner of the Internal Revenue Service has the presumption of correctness. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212

(1933); *Norfolk Southern Corp. v. Commissioner*, 140 F.3d 240, 244 (4th Cir. 1998). The taxpayer bears the "risk of non persuasion," and bears "the burden of proving the Government's assessment wrong by a preponderance of the evidence." *United States v. Pomponio*, 635 F.2d 293, 298 n. 4 (4th Cir.1980); see also *Higginbotham v. United States*, 556 F.2d 1173, 1176 & n. 3 (4th Cir.1977) (explaining that the taxpayer has the "burden of proving the government wrong by a preponderance of the evidence"); *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943) ("an income tax deduction is a matter of legislative grace and ... the burden of clearly showing the right to the claimed deduction is on the taxpayer"); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992) (following *Interstate Transit Lines* ).

■ Debtors thus carry the burden of persuading the court of their entitlement to the I.R.C. § 475 deduction of $45,922,261. Neither I.R.C. § 475, nor the Treasury Regulations, prescribe a valuation method for taxpayers to utilize when making the mark to market calculation, an omission recognized by the United States Tax Court. In *Bank One Corp. v. Commissioner*, the court observed the absence of prescribed "valuation rules" under I.R.C. § 475 and concluded that it "must construe the statutory text in light of all pertinent evidence, textual and contextual, of its meaning." 120 T.C. 174, 279, 2003 WL 2012540 (2003); citing *Commissioner v. Soliman*, 506 U.S. 168, 173, 113 S.Ct. 701, 121 L.Ed.2d 634 (1993); *Crane v. Commissioner*, 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); *Old Colony R. Co. v. Commissioner*, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484 (1932).

*Bank One Corp.* concerned the valuation of swap agreements, a form of financial derivatives dependent on the change in value of an underlying asset or the movement of a rate or index, whereas the instant controversy revolves around the valuation of accounts receivable. *Bank One Corp.*, however, is instrumental in this court's determination of whether debtors have carried their burden of proving the Government's assessment wrong by a preponderance of the evidence. *Bank One Corp.* rejected the taxpayer's argument that its burden was simply to prove that its method of reporting its swap income was reasonable. 120 T.C. at 287. The court stated that I.R.C. § 446(b) "requires a method of accounting which clearly reflects the taxpayer's income for purposes of federal income taxes." *Id.* at 288. The court further explained, "[T]he Commissioner is given broad discretion under section 446(b) to determine whether an accounting method clearly reflects income, and his exercise of authority under the section is given 'much latitude' and cannot be disturbed unless 'clearly unlawful' or 'plainly arbitrary.'" *Id.* at 288; citing *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532–33, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979); *Lucas v. Am.Code. Co.*, 280 U.S. 445, 449, 50 S.Ct. 202, 74 L.Ed. 538 (1930); *Am. Fletcher Corp. v. United States*, 832 F.2d 436, 438 (1987).

Further, the contest between a taxpayer and the Service is not a battle of accounting methods whereby the party whose expert witness demonstrates a superior accounting method wins. "When a taxpayer challenges the Commissioner's authority under section 446(b), we inquire whether the accounting method in question clearly reflects income. The answer to this question does not hinge on whether the taxpayer's method is superior to the Commissioner's method, or vice versa." *Bank One Corp.*, 120 T.C. at 290; citing *RLC Indus. Co. & Subs. v. Commissioner*, 98 T.C. 457,

492, 1992 WL 80336 (1992), aff'd 58 F.3d 413 (9th Cir.1995); *Wal–Mart Stores, Inc. & Subs. v. Commissioner,* T.C. Memo. 1997–1, 1997 WL 1227; *Brown v. Helvering,* 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1934).

To resolve the instant dispute, the court does not need to determine which party, the Service or debtors, has applied the superior valuation method to debtors' accounts receivable, and the court does not need to determine the actual value of debtors' accounts receivable. The court must determine whether debtors' valuation method clearly reflects their income. Consequently, debtors' valuation method must adjust the recorded value of the accounts receivable to their market price as of February 28, 1997. The court in *Bank One* came to the same conclusion: "Given that the Treasury Department has yet to prescribe these regulations, we believe it only natural to conclude that [the Taxpayer] must use under section 475 a method of accounting that accurately marks its financial derivatives to their market price as of the requisite valuation date." *Id.* at 300.

█ Debtors and the Service both persuasively attack the accuracy and the propriety of the other's valuation method. But the burden of persuasion is with debtors, and the parties' successful attacks do not cancel out each other. *Raleigh,* 530 U.S. at 26, 120 S.Ct. 1951; *Welch,* 290 U.S. at 115, 54 S.Ct. 8; *Norfolk Southern Corp.,* 140 F.3d at 244. Debtors must show a right to the deduction. *Interstate Transit Lines,* 319 U.S. at 594, 63 S.Ct. 1279. Debtors can only demonstrate their statutory right to the I.R.C. § 475 deduction by persuading the court that their method of valuing the receivables "clearly reflects income." *Bank One Corp.,* 120 T.C. at 290.

In other words, debtors must persuade the court that their valuation method, which they contend justifies an I.R.C. § 475 loss deduction, clearly reflects an actual loss equal to the decrease in value of their accounts receivable at February 28, 1997.

While the face amount of the accounts receivable is known and not in dispute, the value of the stream of cash the receivables will produce as customers pay the amounts they owe is only capable of estimation and not agreed upon by the parties. The parties do agree that the value of the stream of cash will be less than the face amount of the receivables as some customers will never pay, debtors will incur costs in collecting the payments from customers, the present value of one dollar one year from now is not worth as much as the same dollar now, etc. The parties must consider these variables when determining the actual present value to debtors on February 28, 1997 of accounts receivable whose face amount is undisputed.

Debtors have not carried their burden of persuading the court that their method of valuing the receivables clearly reflects an actual loss from a decrease in value of their receivables below either their face amount or below an already discounted value. As noted above, the Service's expert witness at trial pointed to several flaws in debtors' valuation. Three flaws in particular persuade the court that debtors' have failed to carry their burden of proof that their method of valuing the receivables clearly reflects an actual loss from a decrease in value of the receivables below their face amount or below any already discounted value.[2]

The Ernst & Young valuation rests in part on the estimation that debtors will

**2.** That debtors' expert witness likewise pointed to flaws in the Service's valuation study is superfluous because debtors carry the burden of demonstrating that their valuation method clearly reflects an actual loss.

incur servicing costs equal to three percent of the face amount of the accounts receivable per annum. Higher servicing costs decrease the net proceeds from the receivables, thereby decreasing their value and producing a larger I.R.C. § 475 deduction. Yet debtors have not persuaded the court that their servicing costs are reasonably estimated such that the final valuation of the receivables clearly reflects the receivables' actual value. Debtors' expert witness Ms. Rayner, an Ernst and Young partner who completed the I.R.C. § 475 valuation study, on cross examination acknowledged that she derived the three percent figure from management "servicing cost ratios." Dec. 18 Tr. 164:6–165:19. But Ms. Rayner also acknowledged that when she completed the valuation study she was aware of debtors' Securities and Exchange Commission form 10–k for the period ending February 28, 1997, which explained that debtors' management could not allocate expenses between retail sales and credit operations and therefore could not accurately estimate the contribution of financing operations to net income. Dec. 18 Tr. 166:2–167:1. While debtors' based the information they provided to the Securities Exchange Commission on financial accounting standards and not tax accounting standards, it is questionable that debtors could not allocate expenses related to credit operations for purposes of filing their 10–k but now contend they can allocate the same expenses to produce an approximately $46,000,000 tax deduction when filing their consolidated tax return.

Another questionable facet of debtors' valuation study centers on the "weighted average cost of capital" (WACC) Ms. Rayner uses when discounting to present value debtors' cash receipts from collections of the accounts receivable. Ms. Reyner's WACC analysis is based in part on what she estimates is the weighted average required investment return with respect to

the stock of seven consumer credit card companies. Plaintiff's Exhibit 6:3. Ms. Rayner admitted on cross examination, however, that her valuation study does not explain her criteria for selecting the seven credit card companies she utilized in her WACC analysis from the dozens of existing consumer credit card companies. Dec. 18 Tr. 197:13–20.

A third questionable facet of debtors' valuation centers on discount rates of 8%, 15%, and 22% that Ms. Rayner applied to current accounts, and to 61–120 day and 121–180 day past due accounts respectively. Ms. Rayner transitioned from an 11% WACC to the 8%, 15%, and 22% discount rates, but her valuation study does not support the transition. On cross examination Ms. Rayner explained that these figures are "based on my judgment of doing valuation work for almost twenty years." Dec. 18 Tr. 208:21–22. When asked why there is no explanation of how she picked the three discount rates, she answered, "Because I mean, there isn't. But valuation is typically not, you now, that precise. There's a lot of judgment that goes into that." Dec. 18 Tr. 208:4–12. When asked, "[is it] possible to independently test your judgment on this point," Ms. Rayner responded, "To mathematically calculate my judgment? No." Dec. 18 Tr. 211:205–209. Ms. Rayner's valuation study, and her answers on cross examination, do not support the discount rates she applied to debtors' accounts receivable and do not persuade the court of the appropriateness of the discount figures.

The debtors also successfully attacked at trial the valuation study of the Service's expert witness, Professor Barnhill. Principally, the court is not convinced by that aspect of the Service's valuation method that arrives at a discount rate by comparing debtors' accounts receivable to publicly traded BB rated junk bonds. It is at least

questionable whether Professor Barnhill made every necessary adjustment in his valuation study to reflect the differences between junk bonds and debtors' accounts receivable.

The Service does not contest that 20% of debtors' accounts receivable are past-due, and there is not an active market for the accounts receivable. No bonds with a BB rating are past due, and the evidence does not demonstrate that Professor Barnhill's valuation study reflects this difference. Secondly, BB rated bonds are traded on public markets and therefore are much more liquid than debtors' accounts receivable. Debtors' accounts receivable are illiquid assets, there is no public market on which debtors can sell these assets, and the evidence does not demonstrate that Professor Barnhill's valuation study reflects the liquidity difference between BB rated bonds and the receivables.

Nevertheless, debtors' evidence and argument undermining Professor Barnhill's valuation study do not provide an escape from their burden of satisfying the court's inquiry into whether their "accounting method clearly reflects income." *Bank One Corp.,* 120 T.C. at 290. The court cannot find that the Ernst & Young valuation study led debtors to a loss deduction that clearly reflected their income (or loss in the instant case). Consequently, the court upholds the Service's determination and its claim for income tax and statutory pre-petition interest for debtors' taxable year ending February 28,1994, in the amount of $4,805,984, is allowable in full. The Service's allowed pre-petition claims against debtors' estate are $4,815,907.51, which include the I.R.C. § 475 claim of $4,805,984 and the two undisputed claims, a pre-petition highway use tax assessment of $9,842.62 for the period ended June 30, 2001, and a withholding tax assessment of $80.89 for the period ended December 31, 1999. Debtors admit liability for the latter two pre-petition claims in the first Stipulation of the Parties, paragraphs eight and nine.

A separate order will be entered.

### *ORDER*

Hearing was held on January 14 and 28, 2004 on debtors' objection to claim number 1943 in the amount of $4,815,907.51 filed by the United States of America, Internal Revenue Service. For the reasons given in the appended memorandum opinion, the court overrules the debtors' objection. Accordingly, it is

**ORDERED** that debtors' objection to proof of claim number 1943 is overruled, and the claim is allowed in the amount of $4,815,907.51.