### NATIONAL ASSOCIATION OF LIFE UNDERWRITERS, INC., Appellant,

v.

### COMMISSIONER OF INTERNAL REVENUE, Appellee,

American Society of Association Executives, Society of National Association Publications, District of Columbia Institute of Certified Public Accountants, Amici Curiae.

No. 93–1257.

United States Court of Appeals, District of Columbia Circuit.

Argued May 12, 1994.

Decided Aug. 12, 1994.

Albert G. Lauber, Jr., Washington, DC, argued the cause for appellant. With him on the briefs were Leonard J. Henzke, Jr., Joseph Greif and William B. Scher, Jr., Washington, DC.

Steven W. Parks, Attorney, U.S. Dept. of Justice, Washington, DC, argued the cause for appellee. With him on the brief were Loretta C. Argrett, Asst. Atty. Gen., and Gary R. Allen and Richard Farber, Attys., U.S. Dept. of Justice, Washington, DC.

On the brief for amici curiae American Soc. of Ass'n Executives, et al. was Frank M. Northam, Washington, DC. George D. Webster, Washington, DC, entered an appearance.

Before: MIKVA, Chief Judge;
BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

National Association of Life Underwriters, Inc. ("NALU"), is a federation of state and local associations of life insurance underwriters (referred to collectively simply as "local associations"), and is engaged in education and the promotion of legislation on life and health insurance. Although a tax-exempt "business league" under 26 U.S.C. § 501(c)(6), NALU is subject to tax on its unrelated business income under 26 U.S.C. §§ 511–13. Here it appeals a Tax Court decision upholding the determination by the Commissioner of Internal Revenue of tax deficiencies based on its revenues from the sale of commercial advertising in its monthly professional journal, Life Association News ("LAN"), see *id.* § 513(c), for the tax years ending August 31, 1981, 1982 and 1983. See *National Ass'n of Life Underwriters v. Commissioner,* 64 T.C.M. (CCH) 379, 1992 WL 184956 (1992).

■ The taxable revenue from the sale of commercial advertising is calculated as: gross advertising income *minus* direct advertising costs; the net, if positive, may be reduced by excess readership costs, defined as the excess, if any, of readership costs over circulation income. See 26 C.F.R. § 1.512(a)1. NALU disputes the way in which the Commissioner, affirmed by the Tax Court, determined circulation income and direct advertising costs.

As to circulation income, NALU objects that the Tax Court ruled against its position on a theory that the Commissioner did not raise until her post-trial brief, thereby denying NALU a fair chance to respond. We agree that this violated NALU's procedural rights.

■ Computation of direct advertising costs requires, as a preliminary step, determining the portion of the Association's total costs that are properly attributable to the journal. It is this first step which is at issue in this appeal. The regulations provide that once "a reasonable method of allocation" is adopted for this purpose, it "must be used consistently". 26 C.F.R. § 1.512(a)–1(f)(6)(i). Purporting to follow this regulation, the Commissioner made the allocation for the disputed years simply by applying the *ratio* used in two previous years, and the Tax Court accepted this as "reasonable". The mandate to persist with a reasonable *method,* however, is plainly not a direction to persist in use of a particular percentage that a method of allocation has yielded—unless there is reason to believe that the facts producing the earlier percentage are unchanged.

We reverse and remand for reconsideration consistent with this opinion.

\* \* \* \* \* \*

*Circulation Income.* Circulation income includes all income generated by the production, distribution or circulation of the journal, other than gross advertising income. 26 C.F.R. § 1.512(a)–1(f)(3)(iii). Here, however, subscription to LAN was tied to membership in a local association. There was no option to join an association and not take a subscrip-

tion, see NALU Bylaws [1] Art. XX, § 5, nor to take a subscription and not join an association (if the would-be subscriber were eligible to join one). *National Ass'n of Life Underwriters,* 64 T.C.M. at 383. For such cases, a formula is needed to allocate a portion of membership receipts to the publication. The Commissioner has promulgated three rules of allocation, see 26 C.F.R. §§ 1.512(a)–1(f)(3)(iii), (4)(i), (4)(ii) and (4)(iii), and the parties agree that the second of these is inapplicable. NALU argues for the first ("Rule 1"), the Commissioner for the third ("Rule 3"). Rule 1 states:

> *Subscription price charged to nonmembers.* If 20 percent or more of the total circulation of a periodical consist of sales to nonmembers, the subscription price charged to such nonmembers shall determine the price of the periodical for purposes of allocating membership receipts to the periodical.

26 C.F.R. § 1.512(a)–1(f)(4)(i). Rule 3, in pertinent part, states:

> *Pro rata allocation of membership receipts.* Since it may generally be assumed that membership receipts and gross advertising income are equally available for all the exempt activities (including the periodical) of the organization, the share of membership receipts allocated to the periodical, where paragraphs (f)(4)(i) and (ii) of this section do not apply, shall be an amount equal to the organization's membership receipts multiplied by a fraction the numerator of which is the total periodical costs and the denominator of which is such costs plus the cost of other exempt activities of the organization.

26 C.F.R. § 1.512(a)–1(f)(4)(iii). Another regulation sets forth the principles that the three specific rules are intended to implement:

> Where the right to receive an exempt organization periodical is associated with membership or similar status in such organization for which dues, fees or other charges are received (hereinafter referred to as *membership receipts* ), circulation in-

come includes the portion of such membership receipts allocable to the periodical (hereinafter referred to as *allocable membership receipts* ). Allocable membership receipts is the amount which would have been charged and paid if:

> (a) The periodical was that of a taxable organization.

> (b) The periodical was published for profit, and

> (c) The member was an unrelated party dealing with the taxable organization at arm's length.

26 C.F.R. § 1.512(a)–1(f)(3)(iii) (emphasis in original).

NALU's tax liability is much higher under Rule 3 than Rule 1, and the parties agree that if NALU wins on this issue, the remainder of the case is essentially moot, since NALU would then have excess readership costs that would eliminate taxable advertising income in two of the three tax years at issue. *National Ass'n of Life Underwriters,* 64 T.C.M. at 386.

Before the Tax Court, the parties' core positions were as follows: NALU argued that the 127,000 individual underwriters who receive the journal by virtue of their membership in *local* associations were not "members" of NALU within the meaning of these regulations. As total circulation was about 130,000, NALU clearly sold more than 20% to non-members, and so Rule 1 applied. Therefore the "subscription price charged to such nonmembers" controlled. This price, according to the By-Laws, was $1 a year, raised to $1.50 in 1982.

The Commissioner argued that the local association's 127,000 members were in effect members of NALU, or, if not technically members, held "similar status" within the meaning of § 1.512(a)–1(f)(3)(iii) by virtue of being members of the member associations. She also argued that in any event Rule 1 should not apply because the price to individual underwriters was not a reasonable arm's length price.

---

1. All references to NALU Bylaws are to the "Revised 1979" version, Joint Appendix ("J.A.") 226–43, except when explicit reference is made to a variation in the "Revised 1983" version, J.A. 244–61.

The Tax Court rejected the Commissioner's claim that the individual underwriters either were members of NALU or held "similar status". It held that "similar status" was meant to refer merely to a person who has the status of a "member", but has not been so designated. *National Ass'n of Life Underwriters,* 64 T.C.M. at 388. The Tax Court therefore turned to the nature of membership status, and advanced the following test:

> First, a member has specified rights and obligations in relation to an organization, including the right to participate in the organization's direction and the obligation to help support the organization through regular financial contributions. Secondly, all the facts and circumstances, including the organization's charter and bylaws, may be consulted in determining what those rights and obligations are. Finally, labels are not determinative; a person's status will determine whether that person will be considered a member of an organization.

*Id.*

Applying this test, the Tax Court held that only the local associations counted as members of NALU, because "only the local associations had both specified rights and obligations in relation to [NALU]". *Id.* While the local associations have individual underwriters as members, NALU itself does not, although individual underwriters are allowed to identify themselves as members of NALU. Compare NALU Bylaws Art. V., § 1 (local association members must be *individuals* in the active, associate or honorary class), with NALU Bylaws Art. XIII (while individual members of local associations "may use the name or style 'Member of [NALU]'", such use "shall not confer membership upon individuals in any way, as membership itself and all rights, powers, and duties thereof are exclusively reserved to member associations"). According to its Bylaws, local associations are NALU's only type of member. See NALU Bylaws Art. III, § 2(a) (NALU has the power "[t]o elect *associations* to membership", but with no mention of a corresponding power in regard to individual underwriters) (emphasis added); Art. IV, § 1 ("NALU shall be a federation of state and local member associations"). The Tax Court pointed out that under NALU's voting structure, the local association from Lodgepole, Nebraska, with 17 members, had as much power as the one from New York City, with 3000 members. *National Ass'n of Life Underwriters,* 64 T.C.M. at 389. The court concluded that the individual underwriters did not have any rights or obligations in NALU, and that they did not possess the status of a member as defined in NALU's Bylaws. *Id.*

Having rejected the Commissioner's primary theory, the Tax Court turned to an alternative that she had advanced only in her post-trial brief. This was her contention that it was the local associations that had the right to receive a subscription to LAN for each of their individual association members. In this case, of course, the 127,000 subscriptions for individual underwriters would now be construed as sold to *members,* i.e., the local associations. Rule 3 would apply rather than Rule 1, since member sales would now constitute more than 97% of circulation.

■■■■ This analysis contradicted the Commissioner's pleadings. In her answer the Commissioner had admitted that "individual underwriters paid for their LAN subscription at the same time they paid their dues". J.A. 82. Such admissions in the pleadings are binding, although the pleadings may under some conditions be amended. *Missouri Housing Development Comm'n v. Brice,* 919 F.2d 1306, 1315 (8th Cir.1990); *American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir.1988) ("[U]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court. Not only are such admissions and stipulations binding before the trial court, but they are binding on appeal as well") (quoting *Ferguson v. Neighborhood Housing Services,* 780 F.2d 549, 551 (6th Cir.1986). See also Rule 15(a) of the Federal Rules of Civil Procedure; 6 Wright & Miller, *Federal Practice and Procedure: Civil* § 1488, at 659–62 (2d ed. 1990) (amendment of answer foreclosed where moving party has delayed and delay has prejudiced another party). The same rule applies in the Tax Court. *Haag v. Commissioner,* 88 T.C. 604, 615 n. 5, 1987 WL 49288 (1987) (Commissioner is

bound by admission in answer). See also Tax Court Rule 41 (with limited exceptions, "a party may amend a pleading only by leave of court or by written consent of the adverse party, and leave shall be given freely when justice so requires").

 These principles apply to issues of fact. For matters of legal theory, the underlying rules appear in substance the same; although there is no pleading to be amended, the key constraint is still avoidance of prejudice to the adversary. Normally the Tax Court will not consider arguments raised for the first time in a post-trial brief, see, e.g., *Sundstrand Corp. v. Commissioner*, 96 T.C. 226, 347–49, 1991 WL 18180 (1991), and it is reversible error for it to do so where the opposing party is prejudiced. *Baird v. Commissioner*, 438 F.2d 490, 493 (3rd Cir.1971); cf. *Centel Communications Co. v. Commissioner*, 920 F.2d 1335, 1340 (7th Cir.1990) (noting that Tax Court "consistently has refused to consider issues first raised in the parties' post-trial brief when surprise and prejudice are found to exist"); *Ware v. Commissioner*, 906 F.2d 62, 65 (2nd Cir.1990) (Tax Court may rely on a theory not raised until post-trial briefs "unless [the] theory is precluded by the pleadings, or its late introduction specifically prejudices the opposing party in presenting its case").

 NALU argues that the Commissioner's last-minute offer of her new contention or theory was indeed prejudicial. While NALU had presented testimony at trial to demonstrate that individual underwriters were "nonmembers" of NALU, it had perceived no similar need to show that individual underwriters purchased the journal, since the Commissioner had admitted this. This alternative evidence, it says, would have taken the form of testimony on how ambiguous bylaw provisions had been construed in the past, as well as other testimony showing that individual underwriters, and not the local associations, were the subscribers.

On one view, the substantive issue in dispute appears largely one of how to *characterize* the transactions involved, the raw facts

seeming to be established. If we were confident of this view of the matter, then we might doubt the existence of any prejudice—NALU had a chance to reply on the issue in its post-trial reply brief.[2] But both the parties throughout this litigation appear to have regarded the application of Rule 1 or Rule 3 as an issue to be resolved *not* primarily by focus on the economic relations established by undisputed sections of the bylaws (e.g., the fact that subscription was tied to membership in NALU's member local associations), but largely on nuances of language and meaning seemingly independent of economic relations. Under that approach, lack of a chance to present testimony on the Commissioner's new theory might well have been fatal to NALU's position.

Accordingly, we reverse and remand for further proceedings consistent with this opinion. The Commissioner might get her new approach in if she can persuade the Tax Court to allow amendment, which can be granted in its discretion so long as prejudice to NALU is averted (perhaps by allowing admission of additional evidence). See Tax Court Rule 41. Our remand does not foreclose the Tax Court's reexamination of its position on the Commissioner's original theory—namely, that for purposes of the applicable regulations, the individual underwriters were both the purchasers of the magazine and members of NALU, or persons having "similar status" to members of NALU.

*Determining Deductible Advertising Costs.* As a preliminary step to determining deductible advertising costs, it is necessary to determine total journal costs. These have two components: (1) those costs that are wholly attributable to journal activity and (2) "dual-use" expenses—often termed "indirect costs"—which are partly attributable to journal activities and partly to others. Indirect costs include such things as management salaries, utilities, depreciation, repairs and maintenance, taxes and office supplies. The issue here is the method for allocating these latter costs, which the Treasury regulations require to be done "on a reasonable basis". 26 C.F.R. § 1.512(a)–1(f)(6)(i). Once a rea-

---

2. Not much chance, perhaps, for the Commissioner devoted only two pages of her 181–page post-trial brief to the subject and presumably the remaining 179 pages required some response.

sonable method of allocation is adopted, it must be used consistently. *Id.*

In the course of the Commissioner's audit of the disputed tax years, the parties came to agreement that NALU's allocations of indirect costs for its 1982 and 1983 returns were inaccurate, evidently due to confusion among its accountants. NALU proposed an elaborate eight-step process which it said was a more refined and systematic version of its previous methodology. The crucial step in the method was Step 4, which employed a direct-cost allocation to apportion the indirect cost; in other words, it used the ratio between journal and non-journal direct costs to allocate the indirect ones. The Commissioner responded with the view that the percentage of dual-use costs that NALU claimed for the journal in 1978 and 1979, namely 27%, was itself a "reasonable" method, and that under 26 C.F.R. § 1.512(a)–1(f)(6)(i) it should therefore be consistently applied. Thus, she fixed 27% as the allocation for the years in dispute, and, presumably, as NALU notes, forever after. The Tax Court upheld the Commissioner's determination. *National Ass'n of Life Underwriters*, 64 T.C.M. at 392–94. As NALU itself argued that its prior method had been reasonable, and as 26 C.F.R. § 1.512(a)–1(f)(6)(i) required that a reasonable method once adopted be consistently applied, the court affirmed the Commissioner's determination.

■■■■ The critical step in all this is the characterization of 27% as a "method of allocation" within the meaning of 26 C.F.R. § 1.512(a)–1(f)(6)(i)'s requirement that a reasonable "method of allocation", once adopted, be "used consistently". In some contexts perhaps a percentage may be a method of allocation, as where some authority conclusively determines that a specific percentage will be used (e.g., the 27.5% for many years specified by Congress for calculating oil and gas depletion). The context here forecloses such a view. The regulation, after setting forth the requirement of consistency, goes on to give examples:

Thus, for example, salaries may generally be allocated among various activities on the basis of the time devoted to each activity; occupancy costs such as rent, heat and electricity may be allocated on the basis of the portion of space devoted to each activity; and depreciation may be allocated on the basis of space occupied and the portion of the particular asset utilized in each activity. Allocations based on dollar receipts from various exempt activities will generally not be reasonable since such receipts are usually not an accurate reflection of the costs associated with activities carried on by exempt organizations.

In the examples, as the amounts of time or space devoted to each activity alter over time, so would the resulting allocation of costs. The Commissioner's fixed 27% obviously does not qualify as a method under her regulations.

The Commissioner stresses that it is the taxpayer's burden to show consistent application of a reasonable method, and the parties have not fully developed the issues as to the reasonableness or historical provenance of NALU's method. But even if we assume that that default can be charged to NALU, it would not follow that the Tax Court could uphold the Commissioner's ad hoc percentage. The regulations require use of a reasonable method, and the 27%, while it may have been a reasonable output of a method in 1978 and 1979, is not a method. Even a taxpayer who fails to successfully establish the reasonableness and historical justification of its own method cannot be subject simply to the fiat imposition of a random number.

\* \* \* \* \* \*

We reverse and remand the case to the Tax Court for proceedings consistent with this opinion.

*So ordered.*