**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 05-1667**

———————————

In re:  HEILIG MEYERS COMPANY, d/b/a RoomStore
Furniture, ValueHouse, RentSmart, John M.
Smyth's  Homemakers,  West  End  Furniture
Company, The HUB, The RoomStore Furniture,
Baton Rouge Furniture Outlet, Bedding Experts,
Incorporated,  Ganz  Furniture,  Guardian
Protection  Products  I,  Heath  Furniture,
McMahan Furniture, Renfrows Furniture, Rhodes
Furniture, Brown's Furniture,

                                           Debtor.

--------------------------------------------------

HEILIG MEYERS COMPANY; HEILIG-MEYERS FURNITURE
COMPANY;  HEILIG-MEYERS  FURNITURE  WEST,
INCORPORATED; HMY STAR, INCORPORATED; HMY
ROOMSTORE,  INCORPORATED;  MACSAVER  FINANCIAL
SERVICES, INCORPORATED,

                           Plaintiffs - Appellants,

       versus

INTERNAL REVENUE SERVICE,

                          Defendant - Appellee,

       and

OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

                               Creditor,

       and

US TRUSTEE, Richmond,

Trustee.

_____

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.   Henry E. Hudson, District
Judge.   (04-858-3-HEH; 00-34533-DOT; 03-3295-DOT)

_____

Argued:  January 31, 2007                    Decided:  May 9, 2007

_____

Before WILKINSON, NIEMEYER, and SHEDD, Circuit Judges.

_____

Affirmed by unpublished opinion.   Judge Wilkinson wrote the
majority opinion, in which Judge Shedd joined.   Judge Niemeyer
wrote a dissenting opinion.

_____

**ARGUED:** Michael Brown Quigley, WHITE & CASE, Washington, D.C., for
Appellants.   Joan Iris Oppenheimer, UNITED STATES DEPARTMENT OF
JUSTICE, Tax Division, Washington, D.C., for Appellee.  **ON BRIEF:**
Brian S. Gleicher, Brian P. Arthur, WHITE & CASE, Washington, D.C.,
for Appellants.  Chuck Rosenberg, United States Attorney, Eileen J.
O'Connor, Assistant Attorney General, Bruce R. Ellisen, UNITED
STATES DEPARTMENT OF JUSTICE, Tax Division, Washington, D.C., for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Debtors Heilig-Meyers Company et al. filed an adversary proceeding in bankruptcy court challenging a proof of claim filed by the Internal Revenue Service ("the Service") for a deficiency arising from Debtors' undervaluation of their installment accounts receivable under the mark-to-market accounting method set forth at 26 U.S.C. § 475(b) (2000). Debtors contended that their loss calculation and concomitant deduction were reasonable and should be sustained. The bankruptcy court upheld the Service's determination on the ground that Debtors' valuation method failed to reflect income clearly, as required by 26 U.S.C. § 446(b) (2000). The district court affirmed. Debtors now appeal, claiming that the § 446(b) clear reflection of income requirement does not apply to the valuation of their accounts receivable, and, in the alternative, that if § 446(b) does apply, the bankruptcy court erred in accepting the Service's determination. Because the assessment of fair market value is the core of the mark-to-market method, § 446(b) was correctly applied to Debtors' valuation. Because the bankruptcy court properly found that Debtors failed to meet their burden of proof, it did not err in upholding the Service's determination. We thus affirm.

This appeal involves a tax issue arising in the course of Chapter 11 bankruptcy proceedings for Debtors Heilig-Meyers Company, Heilig-Meyers Furniture Company, Heilig-Meyers Furniture West, Inc., HMY Star, Inc., HMY RoomStore, Inc., and MacSaver Financial Services, Inc. (collectively "Debtors"). Appellant is Heilig-Meyers Liquidation Trust, successor in interest to Debtors. Debtors were primarily engaged in the retail sale of home furnishings, with a large portion of their sales being made through installment credit purchases. The dispute concerns Debtors' valuation of their installment accounts receivable under the mark-to-market method of accounting pursuant to Internal Revenue Code § 475, 26 U.S.C. § 475, for the tax year ended February 28, 1997.

Section 475 imposes the mark-to-market method of accounting on non-inventory securities held by securities dealers. 26 U.S.C. § 475(a). Under the mark-to-market method, any security that is held by a securities dealer at the end of the year and is not inventory must be "marked to market," i.e., treated as though it had been sold for its fair market value on the last business day of the taxpayer's taxable year. Id. § 475(a)(2)(A). The taxpayer recognizes a gain or loss equal to the difference between the fair market value so calculated and the security's basis. Id. If the taxpayer recognizes a loss on the security -- that is, if the security's fair market value on the last day of the taxable year is

4

lower than its basis -- then the taxpayer receives a tax deduction in the amount of the loss.

It was unclear under § 475 as originally enacted whether the statute's definition of "securities" encompassed debt instruments that constituted customer paper and thus obligated sellers of nonfinancial goods and services to use the mark-to-market method for those items. See Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, 107 Stat. 312, 481; 26 U.S.C. § 475(c)(2)(C). The Department of Treasury promulgated regulations, in effect during the tax period in dispute here, which provided that if sellers of nonfinancial goods and services would not qualify as securities dealers under § 475 but for their nonfinancial customer paper, they did not constitute securities dealers and thus were not required under § 475 to use the mark-to-market method. See 26 C.F.R. § 1.475(c)-1(b)(1) (1997). If, however, the taxpayer so chose, it could elect § 475 treatment. See id. § 1.475(c)-1(b)(3), (4). Thus, for instance, retailers that made loans to customers, such as Debtors in the present case, could elect to treat their accounts receivable in accordance with § 475, using mark-to-market accounting to calculate their gain or loss on such accounts. Congress subsequently eliminated such election by amending § 475 to provide that nonfinancial customer paper did not constitute a "security" for purposes of the statute. See Pub. L. 105-206, Title VII, § 7003(a), 112 Stat. 685, 832 (1998) (codified at 26 U.S.C.

5

§ 475(c)(4)). Thus retailers such as Heilig-Meyers may no longer elect § 475 treatment for their accounts receivable.

For Debtors' taxable year ended February 28, 1997, Debtors elected § 475 treatment for their accounts receivable. Debtors filed an Application for Change in Accounting Method, IRS Form 3115, which the Service approved. Debtors retained Ernst & Young, LLP, to determine the year-end fair market value of their accounts receivable for purposes of § 475's mark-to-market determination. Ernst & Young partner Barbara Rayner ("Rayner") prepared a valuation study of the accounts receivable.

Rayner determined the assets' fair market value using a discounted-cash-flow approach, which calculates an accurate present value by discounting the future cash flow from the asset to present value at an appropriate discount rate. The method requires a determination of the asset's projected cash flow over its life and the selection of an appropriate risk-adjusted discount rate for reducing the future income to its net present value.

In estimating the future cash flow of the accounts receivable, Rayner reduced their face value by (1) the cost of servicing the accounts, estimated at 3% of their face value; (2) anticipated defaults by some customers; and (3) projected income taxes on the receivables' income stream. In discounting the future income to present value, Rayner selected a discount rate using a weighted average cost of capital ("WACC") methodology, which measures a

6

company's cost of debt and equity financing weighted by the percentage of debt and percentage of equity in a company's capital structure. Rayner based her WACC analysis in part on an estimate of the weighted average required investment return with respect to the stock of seven consumer credit card companies. On this basis, Rayner arrived at a WACC of 11%. From that rate she derived three different discount rates for three different categories of Debtors' accounts receivable: a rate of 8% for current receivables, 15% for receivables that were 61 to 120 days delinquent, and 22% for receivables that were 121 to 180 days delinquent. Applying these discount rates, she arrived at a fair market value for the accounts receivable of $1,027,312,671. As the undisputed book value of the accounts receivable was $1,073,234,932, Debtors recognized a loss, and thus a tax deduction, in the amount of $45,922,261. The § 475 deduction contributed to a net operating loss for the tax year ended February 27, 1998, the entirety of which Debtors carried back to the tax year ended February 28, 1994.

The Service later undertook an audit of Debtors' federal income tax returns for the tax years ended February 28, 1994 through February 28, 2001. The Service concluded that, in the return for the year ended February 28, 1997, Debtors inaccurately determined the fair market value of their installment accounts receivable pursuant to § 475. The Service identified a number of problems with Debtors' methodology. In the determination of future

7

cash flow, the Service questioned Debtors' estimation of servicing costs and rejected as improper the reduction of the assets' value by Debtors' anticipated income tax liability on those assets. In the discounting of future income to present value, the Service found Debtors' discount rates excessive and unfounded. It found that the rates allowed too much for risks flowing from potential customer defaults, both in that the rates themselves overestimated the likelihood of such defaults and in that Debtors had already reduced the face value of the receivables for anticipated defaults when estimating future cash flow. The Service found a risk-free discount rate to be more appropriate and, applying a rate of 6.5%, which was the rate of eighteen-month Treasury securities issued in February 1997, computed the fair market value of the accounts receivable as $1,048,940,674, which resulted in a loss and deduction of $24,294,258 rather than $45,922,261. The Service thus disallowed $21,628,003 of Debtors' § 475 deduction.

After Debtors filed for bankruptcy protection, the Service filed an amended proof of claim seeking to recover, among other amounts,[1] $3,923,904 for underpayment of tax arising from Debtors' inaccurate § 475 determination and $882,080 in statutory pre-petition interest, for a total of $4,805,984. Debtors commenced this adversary proceeding in the bankruptcy court, objecting to the Service's proof of claim.

---

[1]Other amounts sought by the Service involved claims not related to this dispute.

The bankruptcy court heard argument and testimony on December 18, 2003 and January 16, 2004. The Service called Theodore Barnhill, Jr., a finance professor at George Washington University, to testify to the problems with Debtors' methodology. Barnhill conducted his own valuation of Debtors' accounts receivable as of February 28, 1997, using the discounted-cash-flow method. Barnhill employed a range of discount rates from 6.2% to 7.3%, applying the lower rate to accounts maturing earlier and the higher rates to accounts maturing later. Based on this method, Barnhill calculated Debtors' § 475 deduction at $30,974,000, more than the IRS's calculation of $24,294,258 and less than Debtors' calculation of $45,922,261. Barnhill offered several criticisms of Debtors' method, including Rayner's estimation of cash flows on a pre-tax basis, her inappropriate use of a WACC methodology to arrive at discount rates, and her lack of quantitative justification for her choice of the three discount rates for three categories of receivables.

Debtors attacked Barnhill's method as inferior to Rayner's. They acknowledged that they no longer had accounting records for the accounts receivable and thus could not provide any substantive support for the assumptions upon which Rayner's valuation was based. Rayner acknowledged that her valuation report did not explain her choice of seven consumer credit card companies for the WACC determination or her selection of discount rates of 8%, 15%,

9

and 22%.  She offered as an explanation for these choices her judgment as a valuation expert.

In their initial post-trial brief, Debtors contended that their valuation method need only be "reasonable" to satisfy I.R.C. § 475.  For support, Debtors cited <u>Bank One Corp. v. Commissioner</u>, 120 T.C. 174 (2003), which also involved the mark-to-market method of accounting.  In its post-trial reply brief, the Service responded that the Tax Court in <u>Bank One</u> held that valuation of property under § 475 is a method of accounting that must clearly reflect income in accordance with § 446(b).  The Service contended that Debtors therefore had to prove that the Service's determination was unlawful or arbitrary.

In its opinion, the bankruptcy court held that Debtors' valuation method was subject to § 446(b).  The court noted that in <u>Bank One</u>, the Tax Court held that the taxpayer's burden was to prove that the Commissioner's determination was clearly unlawful or plainly arbitrary, by establishing that its own method clearly reflected income.  <u>In re Heilig-Meyers Co.</u>, 316 B.R. 866, 870 (Bankr. E.D. Va. 2004).  The court found that Debtors failed to meet this burden due to three flaws in its valuation.  First, Rayner's estimate of servicing costs at 3% of the face value of the accounts receivable was contradicted by Debtors' contemporaneous assertion on an SEC Form 10-K that they could not accurately calculate figures necessary to such an estimation.  <u>Id.</u> at 871-72.

Second, Rayner's WACC analysis was questionable because she was unable to justify her selection of the seven particular credit card companies on which she based her analysis. Id. at 872. Third, Rayner did not adequately justify or provide independent verification for the three discount rates she chose. Id. The court found that while Debtors had raised questions about the valuation study of Service expert Barnhill, the fact remained that Debtors bore the burden of showing their accounting method clearly reflected income. Id. at 873. The court allowed the Government's claim in the amount of $4,815,907.51, which included the recalculation of the § 475 deduction in the amount determined by the Service. Id.

In the district court, Debtors argued that the bankruptcy court erred in applying the § 446(b) clear reflection of income requirement and should instead have considered Debtors' valuations under a reasonableness standard. Debtors also argued that, even if § 446(b) applied, the bankruptcy court had to make findings that the Service's valuation clearly reflected income before it could uphold the Service's determination. The district court affirmed the bankruptcy court. It upheld the application of § 446(b) because "[t]he income tax regulations clearly provide that '[t]he term 'method of accounting' includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item.'" In re Heilig-Meyers Co., No. 00-34533, 2005 WL 1303351, at

11

*3 (E.D. Va. 2005) (quoting 26 C.F.R. § 1.446-1(a)(1)). The district court further held that Debtors bore the burden of showing that the Service's determination of deficiency was clearly unlawful and that they had failed to do so. Id. at *4. Debtors appeal.

This Court reviews the judgment of a district court sitting in review of a bankruptcy court de novo, using the same standards of review used in the district court. Thus we review the bankruptcy court's factual findings for clear error and questions of law de novo. In re Litton, 330 F.3d 636, 642 (4th Cir. 2003).


II.

Debtors' principal contention is that § 446(b) does not apply to the determination of the fair market value of their accounts receivable because such a determination does not constitute a method of accounting governed by § 446(b). We hold that the bankruptcy court properly applied § 446(b).

Section 446 sets forth, and indeed bears the title of, a "[g]eneral rule for methods of accounting." 26 U.S.C. § 446. Section 446(a) provides, "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Id. § 446(a). Section 446(b), meanwhile, sets forth an important exception: "[I]f the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion

12

of the Secretary, does clearly reflect income." Id. § 446(b). Treasury Regulations further provide that "no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income." 26 C.F.R. § 1.446-1(a)(2).

Section 446 constitutes a recognition that the aims of financial accounting and tax accounting, while sometimes congruent, often diverge. See Thor Power Tool Co. v Comm'r, 439 U.S. 522, 542 (1979) (noting the "vastly different objectives that financial and tax accounting have"). While financial accounting aims "to provide useful information to management, shareholders, creditors, and others properly interested," tax accounting serves to facilitate the "equitable collection of revenue" and to "protect the public fisc." Id. For this reason, an accounting method that may be entirely satisfactory for book purposes may be unsatisfactory for reporting taxable income. The design of § 446 is clear: whatever accounting method is used by the taxpayer to calculate income, that method must render a clear reflection of income consistent with the goals of the Internal Revenue Service, as determined by the Service.

As part of § 446's general rule, § 446(b)'s clear reflection of income requirement applies to all methods of tax accounting. As the Treasury Regulations make clear, "The term 'method of accounting' includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item." 26

13

C.F.R § 1.446-1(a)(1); see Thor, 439 U.S. at 531 n.10. Thus the clear reflection of income requirement applies both to the taxpayer's overall accounting method, e.g., cash method or accrual method, and also to the "accounting treatment of any item," such as inventory accounting for items of inventory, or mark-to-market accounting under § 475. 26 C.F.R § 1.446-1(a)(1); see 26 U.S.C. §§ 471-74 (inventory accounting); id. § 475.

This case concerns what it means to say that the accounting treatment of an item -- specifically, the marking to market of Debtors' accounts receivable under § 475 -- is subject to § 446(b)'s clear reflection of income requirement. It is undisputed that § 446 allows the Service to determine whether a given accounting method -- either an overall method or the method for a specific item -- is an appropriate method for accurately representing taxable income. If the type of accounting method used by the taxpayer does not result in a clear reflection of income, the Service may compel the taxpayer to employ another method. See id. § 446(b).

Debtors recognize this power of the Service, but they contend that it constitutes the entire scope of § 446(b). Once the question of what accounting method to use is settled, Debtors argue, the taxpayer's particular employment of that method is not governed by § 446(b). Thus they argue that § 446(b) has no relevance in this case, where it is undisputed that Debtors sought

14

and received the Service's approval to use § 475's mark-to-market method on their accounts receivable.  Rather, Debtors claim, this conflict pertains merely to valuation, and thus the § 446(b) clear reflection of income requirement has no bearing.  The Service, in invoking § 446(b), is improperly framing a valuation dispute as a clash over accounting methods.

Debtors' contention is not supportable.  The Supreme Court's elucidation of § 446(b) establishes that it is not limited to the threshold question of which type of accounting method the taxpayer should use.  See Thor, 439 U.S. at 532.  Where, as here, the accounting method at issue essentially consists of a determination of market value, § 446(b) applies to that determination.  The conclusions of the Tax Court and one of our sister circuits in the specific § 475 context further confirm that Debtors' reading of § 446(b) is foreclosed in this instance.

In Thor Power Tool Co. v Comm'r, 439 U.S. at 526-27, the Service took issue with tool manufacturer Thor Power Tool Co.'s determination of losses stemming from certain items of inventory -- namely, 44,000 pieces of excess merchandise, most of them spare parts and accessories.  To value these items, Thor employed the "lower of cost or market" (LCM) method of inventory accounting.  See id. at 533.  Under this method, the taxpayer values inventory at either cost or market value, whichever is lower.  See id. at 535.  Thor put the market value of the items of excess merchandise

15

at approximately their scrap value and thus recognized a loss on those items, which contributed to a net operating loss for the year. See id. at 524. Meanwhile, however, Thor continued to offer the "excess" items for sale at their original prices. See id. The Commissioner disallowed the offset on the ground that Thor's valuation of the inventory did not constitute a clear reflection of income as required by §§ 446(b) and 471.[2] Id. at 524, 530. The Court agreed, concluding that "the Commissioner acted within his discretion in deciding that Thor's write-down of 'excess' inventory failed to reflect income clearly." Id. at 537-38.

Thor is significant because there was no contention that Thor should have been using a different type of accounting method. The government did not take issue with the fact that "[a]t all times relevant, Thor has used . . . the 'lower of cost or market' method of valuing inventories." Id. at 525. Nevertheless, this did not answer the question of whether Thor's "particular method" was clearly reflective of income. Id. at 532. The Court agreed with the Commissioner that the taxpayer's particular valuation method had failed to "reduce[] its inventory to 'market' in accord with

_____

[2]Section 471 provides that "inventories shall be taken . . . on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting income." 26 U.S.C. § 471(a). The Supreme Court in Thor made clear that the existence of § 471 is not an indication that § 446(b) does not apply to inventory accounting. Rather, "[i]nventory accounting is governed by §§ 446 and 471 of the Code." 439 U.S. at 531. Thus the Court reinforced what is clear from the face of § 446 -- that it governs all methods of tax accounting.

16

its 'lower of cost or market' method of accounting." Id. at 530; see id. at 532. Thus, the clear reflection of income standard applied not just to the selection of the LCM method over other accounting methods, but to Thor's determination of market value in the course of employing the LCM method.

The circumstances of Thor are strikingly similar to those of the present case. In Thor, the Service asserted that the taxpayer's determination of the market value of certain assets for the purposes of a permitted tax accounting method failed to reflect income clearly. Id. at 537-38. In this case, the Service asserts that the taxpayer's determination of the fair market value of certain assets for the purposes of a permitted tax accounting method failed to reflect income clearly. The only apparent distinction is that in Thor the Treasury Regulations on proper LCM methodology were more specific than those that pertained to Debtors' mark-to-market methodology.[3] The Court concluded that Thor's valuation procedures were "inconsistent with this regulatory scheme." Id. at 535. But this circumstance is immaterial to Thor's application to the present case. The Court noted Thor's lack of regulatory compliance simply as an indication that the Commissioner was within his discretion in finding Thor's

---

[3]Specifically, in Thor, Treasury Regulations defined "market value" to mean the current bid price for the merchandise in the volume usually purchased by the taxpayer and further identified two limited circumstances in which the taxpayer could value inventory at below market value so defined. See id. at 534-35 (citing 26 C.F.R. § 1.471-2(c), -4 (1964)).

17

determinations not clearly reflective of income. See id. at 533, 537. The fact remains that the Court subjected Thor's market value determination to the clear reflection of income standard of § 446(b).

The Tax Court and the Seventh Circuit recently reached the same conclusion about the precise issue in dispute here: the determination of the fair market value of assets under the mark-to-market method of § 475. See Bank One Corp. v. Comm'r, 120 T.C. 174 (2003), aff'd in part, vacated in part sub nom. JPMorgan Chase & Co. v. Comm'r, 458 F.3d 564 (7th Cir. 2006). JPMorgan Chase involved transactions known as interest swaps, which were subject to § 475's mark-to-market method. See 458 F.3d at 568. The Commissioner rejected the taxpayer's determination of the swaps' fair market value as not clearly reflective of income as required by § 446(b). At the Tax Court level, the taxpayer asserted, as Debtors do here, that the dispute was "a 'valuation case,' as opposed to a method of accounting case, and that [taxpayer's] valuations must be sustained because its underlying methodology was reasonable." 120 T.C. at 281. The Tax Court rejected this contention and held that "the reporting of income under section 475, *inclusive of the valuation requirement subsumed therein*, is a method of accounting." Id. at 282 (emphasis added). The Seventh Circuit agreed, stating in no uncertain terms that "[t]he method of determining 'fair market value' under section 475 falls within the

definition of 'method'" for § 446(b)'s requirement that the taxpayer's "method of accounting" must clearly reflect income. 458 F.3d at 570. Thus the Tax Court and the Seventh Circuit rejected Debtors' contention that § 446(b) places no limitations on how the taxpayer implements the mark-to-market method. Instead, the determination of an asset's fair market value for § 475 must clearly reflect income. Id.

In light of this case law, it is difficult to read §§ 446(b) and 475 otherwise than to subject determinations of fair market value under § 475 to § 446(b)'s clear reflection of income requirement. Debtors' position to the contrary is inconsistent with the Court's approach in Thor and directly contradicts the reasoned conclusion of the Tax Court and the Seventh Circuit in JPMorgan Chase. Nor does our conclusion portend, as Debtors claim, that the Service will attempt to bring every valuation dispute within the compass of § 446(b). Here, as in Thor, the accounting method at issue essentially consisted of the determination of the market value of the asset. The LCM method involved in Thor required the valuation of inventory at the lower of market or cost, and thus necessarily entailed the determination of market value. The mark-to-market method of § 475 requires nothing other than that the taxpayer peg the asset's value to its fair market value on the last business day of the taxable year. In such instances, for the taxpayer to fail to assess market value appropriately is in essence

19

for it to have failed to execute the accounting method. In contrast, a valuation that does not constitute the core of an accounting method will not implicate § 446(b). See, e.g., Estate of Godley v. Comm'r, 286 F.3d 210 (4th Cir. 2002) (valuation of asset for estate tax); Krapf v. United States, 977 F.2d 1454 (Fed. Cir. 1992) (valuation of asset donated to charity). Our conclusion today merely gives effect to the unexceptionable proposition that a taxpayer may not, by invoking the name of an accounting method that purports to reflect income, employ a methodology that does not. See Thor, 439 U.S. at 532. To hold otherwise would be to allow taxpayers to subvert the entire aim of § 446 merely by confining the devil to the details. See id. at 536 ("If a taxpayer could write down its inventories on the basis of management's subjective estimates . . . the taxpayer would be able, as the Tax Court observed, to 'determine how much tax it wanted to pay for a given year.'")(citation omitted).

Thus we affirm that Debtors' determination of the fair market value of its accounts receivable under § 475 is subject to § 446(b)'s clear reflection of income requirement.[4]

---

[4]Debtors also argue that, as a procedural matter, the bankruptcy court should not have considered the § 446(b) argument because the Service did not refer to that provision until its post-trial reply brief. While early notice of the Commissioner's legal theory is certainly preferable to late, "the Commissioner does not necessarily forfeit his right to rely on a theory by failing to raise it at the preferred times." Ware v. Comm'r, 906 F.2d 62, 65 (2d Cir. 1990). The question is whether the timing of the argument specifically prejudices the taxpayer. Id.

In this case, Debtors do not identify any manner in which they

III.

Debtors contend that, even if the bankruptcy court did not err in applying § 446(b), it erred in upholding the Service's determination. Having found that the application of § 446(b) was proper, we also affirm the bankruptcy court's factual findings under that standard and its conclusion that the Commissioner's determination should be upheld.

Section 446(b) provides, "[I]f the method used [by the taxpayer] does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Id. § 446(b). This provision gives the Commissioner "broad powers" to reject a taxpayer's accounting method and to substitute his own. See Comm'r v. Hansen, 360 U.S. 446, 467 (1959).

The Supreme Court made clear in Thor that the Commissioner's rejection of the taxpayer's accounting method would be upheld unless the taxpayer showed that it was "clearly unlawful" or "plainly arbitrary." See Thor, 439 U.S. at 532; Bank One, 120 T.C. at 288. In accordance with Thor, Debtors' first burden in this case was to show that the Service's rejection of their accounting

---

were prejudiced, nor do we conclude that they were. Characterizing the Service as claiming that the valuation was not accurate, versus that it did not clearly reflect income, does not change the nature of the dispute or what evidence would be relevant at trial. See, e.g., Nat'l Ass'n of Life Underwriters, Inc. v. Comm'r, 30 F.3d 1526, 1531 (D.C. Cir. 1994) (suggesting no prejudice where question is "how to *characterize* the transactions involved, the raw facts seeming to be established").

method was clearly unlawful or plainly arbitrary. In essence, this burden required Debtors to show that their own method clearly reflected income, for if it did, the Commissioner's determination would perforce be unlawful or arbitrary. See, e.g., Thor, 439 U.S. at 536, 538 (Thor failed to prove Commissioner's rejection of its market valuation was unlawful or arbitrary where it "provided no objective evidence" of its valuation).

The bankruptcy court found that the taxpayer failed to bear this burden due to three specific flaws in its determinations. First, Debtors' estimation of servicing costs at 3% of the face value of the accounts receivable did not square with Debtors' earlier assertion in a Securities and Exchange Commission Form 10-k that they were unable to give an accurate estimate of numbers upon which the 3% figure depended. Second, the bankruptcy court found Debtors' WACC analysis unpersuasive because Debtors' expert Rayner was unable to provide any explanation for how she came to base the WACC analysis on the stock of seven particular consumer credit card companies out of the dozens of such companies that exist. Finally, the bankruptcy court found insufficient support for the three discount rates employed by Debtors, because Rayner offered no explanation for the choice of rates other than her personal judgment as a valuation expert.[5] Given the effect these actions

_____

[5]In addition to these issues noted by the bankruptcy court, Rayner estimated the future cash flow of the receivables on a post-tax rather than a pre-tax basis.

had of inflating the losses recognized by Debtors under § 475, and given Debtors' inability to offer satisfactory explanations for these actions at trial, the bankruptcy court had ample reason to uphold the Commissioner's rejection of Debtors' determinations.

Debtors contend that, even if Debtors' calculations were properly rejected, the bankruptcy court could not uphold the Commissioner's determination without make findings as to its clear reflection of income. In this, Debtors overlook factual findings made by the court and misconstrue their own burden of proof. Under § 446(b), the Service has broad powers not only to reject the taxpayer's accounting method but also to substitute one that, "in the opinion of the Secretary, does clearly reflect income." 26 U.S.C. § 446(b). These powers are not unbounded: like the rejection of the taxpayer's method, the Commissioner's substitution of a new method may not be clearly unlawful or plainly arbitrary. See Dayton Hudson Corp. & Subsidiaries v. Comm'r, 153 F.3d 660, 667 (8th Cir. 1998) (taxpayer succeeded in establishing that "the Commissioner's method does not reflect income and is plainly arbitrary"); Russell v. Comm'r, 45 F.2d 100, 101 (1st Cir. 1930) ("An arbitrary adoption of a substitute method of computing a tax, which does not in fact 'clearly reflect the income' of the taxpayers, cannot be sustained."). This standard squares with the general principle in federal tax disputes that the Commissioner's determination of deficiency will not be overturned unless the

23

taxpayer proves it is "arbitrary and excessive."  Cebollero v. Comm'r, 967 F.2d 986, 990 (4th Cir. 1992) (quoting Helvering v. Taylor, 293 U.S. 507, 515 (1935)).

Under this standard, after the bankruptcy court rejected Debtors' method as not clearly reflective of income, it was not then the court's task to determine de novo whether the Commissioner's method clearly reflected income.  It was rather Debtors' burden to prove that it did not.  The Seventh Circuit recently and persuasively addressed this issue in JPMorgan Chase. In that case, as noted above, the Seventh Circuit affirmed the Tax Court's conclusion that fair market valuation of interest swaps under § 475 was subject to the § 446(b) clear reflection of income requirement.  458 F.3d at 570.  The Tax Court, however, after rejecting the taxpayer's method, went on to analyze the Commissioner's method to determine whether it accurately reflected the fair market value of the swaps.  120 T.C. at 329-30.  The Tax Court found that it did not and instructed the parties to prepare a new computation following the court's instructions.  Id. at 331. The Seventh Circuit rejected this approach.  Recognizing that "the Supreme Court instructs that the Commissioner's interpretation may not be set aside unless clearly unlawful or plainly arbitrary," it concluded that "the tax court was required to defer to the Commissioner's method of calculating fair market value."  458 F.3d at 570 (internal quotation marks omitted).

24

Similarly, in this case, the bankruptcy court properly upheld the Service's determination. The bankruptcy court opinion offers sufficient grounds for its conclusion that the Commissioner's determination should be upheld. The only deficiency the court notes in relation to the Service's claim regards one aspect of its expert Barnhill's valuation study. See In re Heilig-Meyers Co., 316 B.R. at 872-73. The bankruptcy court then went on explicitly to uphold the Service's determination of the § 475 loss and the amount of tax owed. Id. at 873. Given these findings, it seems clear that the bankruptcy court did not find the Service's determination to be unlawful and arbitrary, nor does the established record suggest it should have done so. The court must "afford the Commissioner the deference due under the statutory scheme," JPMorgan Chase, 458 F.3d at 570, as "[i]t is not the province of the court to weigh and determine the relative merits of systems of accounting," Brown v. Helvering, 291 U.S. 193, 204-05 (1934). Just as Debtors did not meet their burden of proving that their own method clearly reflected income, they also failed to prove that the Commissioner's did not, and thus the bankruptcy court did not err in upholding the Service's claim in full.

25

A word finally as to the dissent.  The dissent makes no pretense of trying to reconcile its position with the most relevant case from the Supreme Court.  It all but ignores the Thor Power Tool decision.  The Court in Thor took exactly the approach that we do here, finding that, regardless of the fact that the taxpayer's overall accounting method and specific accounting method were agreed upon, the taxpayer's particular way of determining market value was subject to § 446(b)'s clear reflection of income requirement.  See 439 U.S. at 532.  At issue in Thor was the valuation of spare parts in inventory; the taxpayer's method of accounting was required in that case to reflect income clearly, and we can see no reason, nor does appellant suggest any, why the treatment should vary with respect to the accounts receivable in this case.  We are bound to implement the law as interpreted by the Supreme Court, and yet the dissent would overrule the Court on this point summarily.[6]

Nor does the dissent acknowledge that it would place this court at loggerheads with both the Tax Court and the Seventh

---

[6]The dissent's purported distinction of Thor is, as we have noted, "immaterial to Thor's application to the present case.  The Court noted Thor's lack of regulatory compliance simply as an indication that the Commissioner was within his discretion in finding Thor's determinations not clearly reflective of income.  See id. at 533, 537.  The fact remains that the Court subjected Thor's market value determination to the clear reflection of income standard of § 446(b)."  See supra, at 17-18.

Circuit in <u>JPMorgan Chase</u>.[7]  The approaches of the Supreme Court, the Tax Court, the Seventh Circuit, and this court today give effect to a simple proposition -- that the taxpayer may not avail itself of an accounting method, the entire substance of which consists of accurately determining market value, only to implement it in a way that does no such thing.  It is for this reason that "the reporting of income under section 475, inclusive of the valuation requirement subsumed therein, is a method of accounting." <u>Bank One</u>, 120 T.C. at 282.  The dissent's contrary approach accords little respect to this body of law or to "the discretion rested by Congress in the Secretary and the Commissioner for the administration of the tax laws." <u>United States v. Catto</u>, 384 U.S. 102, 114 (1966).  Nor does it afford proper deference to the factual findings of the bankruptcy court and its explicit adoption of the Commissioner's determination in light of the taxpayer's continuing burden of proof.  In all of these respects, we do not write on a blank slate.

Thus we conclude that § 446(b) was properly applied to the valuation of Debtors' accounts receivable under § 475, and we

---

[7]The dissent suggests that the Seventh Circuit in <u>JPMorgan Chase</u> placed the burden on the Service to establish that its method was lawful and not arbitrary.  But the Court in <u>JPMorgan Chase</u> clearly stated, "In applying the arbitrary or unlawful standard, the tax court should bear in mind that the taxpayer retains the burden of proof."  458 F.3d at 571.  The dissent also entirely ignores the fact that the Seventh Circuit only remanded on this issue because the Tax Court made an error that the bankruptcy court here did not: it showed too little deference to the Commissioner's method.  <u>Id.</u> at 571-72.

affirm the upholding of the Commissioner's determination.  The judgment of the district court is hereby

AFFIRMED.

NIEMEYER, Circuit Judge, dissenting:

Relying on 26 U.S.C. § 446(b), the majority permits the IRS simply to characterize the dispute in this case as one involving the taxpayer's <u>method of accounting</u> and thereby avoid a trial and decision by a factfinder on the fair market value of the taxpayer's accounts receivable.

During the course of this litigation, the IRS declared that the taxpayer's valuation of its accounts receivable was an <u>accounting method</u> that did not clearly reflect income. Therefore, the IRS claimed its right under § 446(b) to recompute the taxpayer's taxes under a method that does clearly reflect income. The problem with this approach was that the IRS and the taxpayer did not dispute a method of accounting, but only the valuation of the taxpayer's asset -- its accounts receivable. All of the taxpayer's practices properly regarded as methods of accounting were never in dispute, and the methods the taxpayer used clearly reflected income (or loss) to the very last detail.

The IRS and the taxpayer agreed on the taxpayer's overall method of accounting -- <u>the accrual method</u>. The IRS and the taxpayer agreed on how, under the accrual method, to value the taxpayer's accounts receivable -- <u>the mark-to-market method</u>. The IRS and the taxpayer agreed on how to calculate income or loss using the mark-to-market method -- <u>by subtracting the market value of the accounts receivable from their book value</u>. The IRS and the

29

taxpayer agreed on the method of determining the market value of the receivables -- <u>by reducing the book value to present value by applying a discount rate</u>.  The IRS and the taxpayer agreed on the book value of the accounts receivable -- <u>$1,073,234,932</u>.  Finally, the IRS and the taxpayer agreed on how to determine the discount rate -- <u>by adding a risk premium to the risk-free rate of return</u>.  In short, there was no disagreement over the taxpayer's <u>method of accounting</u>.[*]  Moreover, this agreement on accounting methods resulted in very similar valuations.  The IRS and the taxpayer agreed on a value of the taxpayer's accounts receivable within 2%.  The narrow disagreement between the IRS and the taxpayer was over the proper risk premium to add to the risk-free rate of return to get a discount rate to apply to the book value, ultimately to reach the market value.  That narrow issue is a factual question that must be resolved by a factfinder.

Under the majority's view, the taxpayer never receives a trial on the fact of the appropriate risk premium by which to discount

---

[*]This agreement on the method of accounting makes this case quite different from <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522 (1979), on which the majority relies.  In <u>Thor Power Tool</u>, the taxpayer's "method of inventory accounting" was "plainly inconsistent with <u>the governing Regulations</u>" and the taxpayer "'made no effort to determine the purchase or reproduction cost' of its 'excess' inventory."  <u>Id.</u> at 532-33, 535 (emphasis added).  This distinction also applies to <u>JPMorgan Chase & Co. v. Commissioner</u>, 458 F.3d 564, 569 (7th Cir. 2006), where the taxpayer's method of accounting similarly violated IRS <u>regulations</u>.  Here, not only was the taxpayer's method of accounting consistent with all governing law and regulations, but the IRS explicitly agreed with the taxpayer's method in all material respects.

30

the book value of its accounts receivable.  Rather, the majority upholds the IRS's post-trial declaration that the selection of a particular risk premium is a <u>method of accounting</u> within the IRS's regulatory purview.  Under the majority's view, <u>at no point</u> is the taxpayer entitled to a finding of fact on the disputed issue by a neutral adjudicator.  Thus, the IRS may always decree that the taxpayer's position on valuing accounts receivable fails to clearly reflect income and therefore is subject to recomputation by the IRS under 26 U.S.C. § 446(b) without a trial.  The IRS's authority to regulate the tax accounting system, however, does not reach down to this level of detail, and it should not.  If the IRS and the taxpayer disagree on the proper discount percentage to apply to the book value of the taxpayer's accounts receivable, the taxpayer is entitled to have a factfinder resolve the disagreement.

What is even more troubling in this case is that even if the IRS had such a broad authority to deny the taxpayer a fact trial on its accounts receivable valuation, its exercise of that power was unreasonable and unfair.  The IRS undertook to exercise its "clear reflection" authority for the first time <u>in a litigation document prepared after trial</u>.  The IRS thus put the taxpayer through an elaborate and costly trial, undertaken to determine the valuation of the accounts receivable, only to then preempt the trial's results by declaring, during post-trial briefing, that the case was resolvable by IRS fiat under § 446(b).  (As the IRS's internal

31

procedures now recognize, this practice was unreasonable.  See Rev. Proc. 2002-18 § 7, 2002-1 C.B. 678).  Deference to the IRS's regulatory authority under 26 U.S.C. § 446(b) should be based on more than the post-trial briefing decision of a Department of Justice line attorney.  See Bowen v. Georgetown University Hospital, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate").

Even under its own rationale, the majority has chosen the wrong remedy.  In cases where the IRS declares unreasonable a taxpayer's method of accounting, the IRS must still demonstrate that its own method is lawful and not arbitrary.  In this case, the bankruptcy court, despite finding several serious flaws with the IRS's valuation, did not decide whether that valuation was lawful and not arbitrary.  The Seventh Circuit, on which the majority relies so heavily, has required just such a remand.  See JPMorgan Chase, 458 F.3d at 572 (vacating in part and remanding for evaluation of Commissioner's chosen valuation method).  The majority improperly assumes that even though the bankruptcy court has never addressed the issue, it would nonetheless uphold the IRS's method.  But that is not our decision to make.

My position is not a far-reaching one -- only a demand for simple procedural fairness.  My position does not deny the IRS any of the authority that it was given under the Internal Revenue Code.

32

I would simply remand this case so that the bankruptcy court can determine the value of the taxpayer's accounts receivable. The IRS should not be able to avoid such factfinding simply by declaring that the taxpayer's "method of accounting" is improper, particularly after agreeing to every aspect of that accounting method. This case centers solely on the proper percentage by which to reduce book value to market value, and up until now, the taxpayer has not had the opportunity to have this issue tried and resolved. Under the majority's holding, it never will.

In sum, I would reverse the judgment of the district court and remand the case to the district court with instructions to remand the case to the bankruptcy court to make a factual finding on the proper valuation of the taxpayer's accounts receivable.